Page number 20-1429, Excel Energy Services Inc., on behalf of the Public Utility Association, Southwestern Public Service Company, Petitioner, versus Federal Energy Regulatory Commission. Mr. Lowell for the Petitioner, Excel Energy Services, Inc. Ms. Gimmel for the Petitioner, Kansas Electric Power Cooperative, Inc. Ms. Becella for the Respondent, Mr. Binet for the Intervenor, Southwest Power Pool, Inc. Good morning, Council. Mr. Lowell, please proceed when you're ready. May it please the Court, my name is Joseph Lowell, I'm an attorney for Excel Energy Services. I'm here today presenting the arguments of the Petitioners regarding the tariff and tariffication of the Federal Reserve 354 in this case. Could you try to speak up just a little bit, please? Thanks. You can also raise the podium, but I think it's okay. Okay. This case concerns attachment Z2 of the SPP tariff, and attachment Z2 sets forth a process of determining cost responsibility for the use of creditable upgrades, which are a type of transmission upgrades that are directly funded by a sponsor. The standard of review in this case for this issue is the arbitrary depreciation standard. When questioned the tariff interpretation, this Court will review the FERC's tariff interpretation, will review the tariff language to determine whether it's ambiguous. If it's unambiguous, it will apply the unambiguous meaning. If it is ambiguous, this Court will defer to FERC's interpretation. If it's reasonable, more of a FERC's interpretation must be supported by the record. If we look at the provisions at issue in this case, attachment Z2, the first key relevant provision of attachment Z2 establishes a rule for who is responsible for paying these revenue credits. And it states that revenues for credits will be provided from new long-term network integration transmission service that could not be provided but for one or more creditable upgrades to accommodate the service. Mr. Gull, one of your arguments is that the N1 contingency analysis is the industry standard here for calculating something like BOP IV upgrades. So what is your evidence that this is the industry standard for that? Especially when we're talking about not calculating things ex-ante but ex-post, where this method seems to be very difficult to implement. So the articulation by FERC that it is only that the N-1 test is only used for initial determinations of upgrade responsibility, as you said, not ex-post, that is a new concept that was announced in this order. We have cited to the precedent that traditionally the BOP IV test, to implement that type of requirement, you need to do an N-1 analysis. So your friends on the other side say that using that method would essentially be so difficult that the petitioners here would end up not paying any upgrade credits because it would be so difficult to calculate under this method. What is your response to that? Well, I have a few comments to that. First, we did argue that the industry standard and FERC precedent traditionally would use the N-1 test to implement the BOP IV language in the tariff. However, even if it were the case that the N-1 tests were too difficult as a method of implementing that language, there may be some other approach that might work, but it would need to still satisfy the condition. It would still need to demonstrate that the service could not be provided without the upgrade. So ultimately, it's what's in the tariff that governs. Do you know what is the implementation of Rule 2? Because as I understand it, Rule 1 deals with flows that are in the same direction as the one that gave rise to the need for the upgrade. But if you go in the opposite direction, the way that the methodology is set out does something more than what happens under Rule 1. Because under Rule 1, everyone who uses the same direction is on the hook. In the opposite direction, not everybody is. It's only if the upgrade made possible the use of the opposite direction. Well, they use some simplifying assumptions. Yeah, you're correct. So Rule 1, if you receive the 3% threshold PDF factor, you're deemed to be using the upgrade under that reservation stack analysis Rule 1. Under Rule 2, they take a look at what the capacity of the system was there before and what the flows are, and then they assume that there is a – they calculate a limit and then try to assume that once you exceed that threshold by stacking transactions going in the reverse direction, that they are then, once they pass that threshold, now using that. Do you have any issue with the way Rule 2 is implemented? We do. So as our expert explained – On the basis that that doesn't qualify as Bud4? Well, it doesn't implement the tariff language, which requires that the service can – if the service could be provided without the upgrade, customers shouldn't have to pay again because we're already paying for the cost of the transmission system. If you're only looking – because we're talking about an electrical circuit, and the flows go where they will, but they generally follow a path of this position. If you're only looking at the impact on this credible upgrade as a way to infer what's happening for the capability of the rest of the circuit to accommodate the flows, we think that's simply invalid. That's employing, we think, an incorrect assumption, and it will not determine whether or not our service could be provided without the upgrade. But at least the way Rule 2 is articulated, it seems consistent with the Bud4 goal. It may be that in pursuit of the Bud4 goal, there's something going on that's awry in the way that you're describing it. I think I agree with you that in Rule 2, we are attempting to do more, but there is an attempt to do some sort of causation. Whereas in Rule 1, your view is that there's not. Rule 1. Correct. As I said, in Rule 2, we still don't think that that would comply with the terms of Rule 2. Just look at the impacts on that particular part of the upgrade. And then can I ask you about one statement in your brief? Sure. So I've gotten some attention in the briefing, but on page 57 – and this goes to some of the arguments about whether the challenger set received adequate notice of the costs. And the brief says the service agreements could have said that it is unknown at this time whether particular upgrade costs will be assignable to the customer, but they did not. Which I read to mean if the service agreements had just said it's unknown, that would be fine. And if that's true, then why does it matter that a tariff might be articulated at a high level of generality such that you don't have the direct ability at that point to discern the precise level of costs that you may be on the hook for? But by your own argument, do you think it would have been fine if they would have just said that it would be totally unknown? Well, not that – what I mean is the service agreement was simply silent. There was no indication whatsoever that we might have this responsibility for the service agreement. And the service agreement, remember, is functioning as sort of the tariff of the menu, and here's what I'm taking up. Here's what I'm paying for. So all I meant was if there was some sort of caveat, if there was some sort of notation that you may be responsible for X, Y, or Z creditable upgrade, it's not been determined yet what that ultimate price is. That might – that would have been more than what's happening. But would that have been okay? I mean, would that have been enough? So you would have gotten a heads up that the precise amount, and even with the precise amount, the precise way in which we're going to calculate the amount, that's unknown. If you would have gotten notice that it's unknown, would your notice-based challenges not exist, or do you have something more to say than that? In this case, well, no. Our notice challenges are beyond that. I mean, for example, in this part of the brief, I think I'm trying to highlight what – the difference between what our studies determine, you know, indicated in response before, what was in our service agreements, and what they didn't say. I – to comply with the tariff, it would need to specify the upgrade and the cost. And if the tariff just said, like this suggests that the agreements would have said that it is unknown at this time whether the particular upgrade costs will be assignable to you, would that have been enough if the tariff said that? No, I don't think so. You don't think so? The tariff would have to say more. Well, the service agreement – I'm sorry, maybe I misunderstood. Are you saying the tariff said you could be responsible for upgrades? Right. No, I don't think so. I mean – well, I was just discussing the rule, the FOA rule. This is a rule that defines who is responsible. If the tariff simply said you might have to pay this, that would still be insufficient. That would be insufficient. That's your argument. I was just thrown a little bit by the language from the brief, which made it seem like it would actually be sufficient if there were just a statement about it being unknown. But that doesn't seem to be your argument. That wouldn't be enough. Right. That's a statement. Now, would you think that the regional operator was required to amend the tier to specifically include this reservation bank analysis? I would – I think that they should have amended the tariff to include it. I mean, interveners and perks have characterized it as a business practice, which is – we don't agree that this is a business practice. It was not presented as such or complied with the normal rules for a business practice. But business practices are certainly allowable, and they may specify the finer details of how to implement tariff language. But it's a pretty standard rule at FERC that business practices cannot vary the tariff. They can't contradict the tariff. And to the extent this is a rule that affects service as it does, it should have been on file with FERC, yes. What about the fact that the petitioners here agreed to the methodology in the white paper? So – So it's not just a business practice, but it is a business practice that the petitioners explicitly approved. Well, I guess Your Honor, we simply would disagree that it is a business practice. You're correct that petitioners endorsed the white paper back in 2012. However, for its part, my client did not understand the white paper proposing an alteration in the meaning of Attachment C-2. Well, if your client thought it was N-1 and then the white paper says reverse stack methodology, then it seems quite obvious – I mean, if that was their understanding originally, why would they endorse the white paper? Well, I don't think they understood at the time what the intent was. I mean, I think if you – if you look – There was a white paper for a second. Okay. Okay. It does propose – Of nature, Your Honor. This is 275. Okay. Next page 3 of the white paper. So if we look on page 3, and my point would be I don't think that the white paper is entirely crystal clear, and I'm not sure – my client did not understand that the intent of this was to change the system. It was a white paper process. It was not a – it was a single process about the white paper and the issues of implementing it, too. But it was not a process to change the tariff, which is a different and separate process under SPP. But didn't everybody understand – everybody had to understand that the tariff was changed at least insofar as it would now go in both directions. I thought that was the whole point of going from Z to Z1, Z2. Or am I – Oh, yeah, no. It's correct. It's what happened in 2008. And it wasn't – Oh, I see. In 2008, they changed it. Got it. Okay. To my point, the last paragraph of page 3 is talking about applying an N-minus-1 analysis to sponsored upgrades to determine whether it's a service. Now, this passage is discussing application of N-minus-1 tests to a subset of credit law upgrades, which are the so-called sponsored upgrades, and are – there are also – But N-minus-1, that's – again, like, that's the initial allocation, right? Isn't a sponsored upgrade referring to an initial allocation? I think this is talking about after sponsored upgrade. This is a sponsored upgrade that's been built, and it's trying to determine whether to apply. Whether it moves from the status of sponsored upgrade to credit law. That's why it's under Z2. But Z1 has to do with sponsor upgrade, right? And Z2 is the credit mechanism by which the sponsor upgrade gets reversed through revenue credits? No, I'm not 100% of that. Well, I think you're on the right track. Z2 is definitely talking about the credits. That's when Z1 is a little broader. It kind of talks about the process by which SPP does its studies. And it talks about the aggregate transmission service study, which is where SPP is batching a bunch of these together. And it does talk about sponsored upgrades. I mean, here it says there's an N-minus-1 analysis prior to the application of the RSA. It's talking about how that will be used to determine sponsored upgrades. But once a sponsored upgrade becomes a creditable upgrade, it will become the base values used in the RSA, the reservation stack. So that seems pretty clear to me that the reservation stack analysis will be used for upgrade credit. That's true. I'm not trying to steer you away from that. I mean, you just said it was unclear. But this is actually, like, pointing me to this paragraph suggests it was quite clear that at least in the white paper, the reservation stack analysis would be used for upgrade credit. Yeah, but this page 3 is talking about applying an N-minus-1 X post to an upgrade. Well, and JoJo, I think we had a little bit of this discussion during the Oklahoma gas case. You asked about the same question. And I told you there that Excel did not understand that it was approving a change to the tariff. And I understand any skepticism you may have. But ultimately, we have a contract with SPP that is comprised of the tariff and the service standard. And if there was a misunderstanding during the white paper process, that's unfortunate. But we're going to – we intended to stand on our contract, right? And the contract has not changed. And I was going to ask you about that because it appears like the white paper is more going to a feasibility analysis. And then how do you feel like it affects the intent of the parties? Because it comes way later than the agreement. Yeah, I don't think it's indicative of the intent of the party in 2008 because it was developed in 2012. It highlights if the N-minus-1 approach is one approach to determining whether a transmission service needs to use a creditable upgrade. But it doesn't express any intent that this is always what they intended. It more is indicating that they did not know how to implement Section 62 at that time. What is the ambiguity you're seeing in this paragraph again? Because I guess I'm following up on Judge Rao's question. It seems like the second sentence of that paragraph says the N-minus-1 analysis will be used to determine whether the sponsored upgrade is needed to provide a new service, which is the antecedent stage where you're trying to decide whether the upgrade is going to happen. Not what the methodology is for determining how the sponsor will be reimbursed by users of the upgrade. The reason I directed us to this page is, number one, there is a suggestion, not by Judge Rao herself, but by FERC and the interveners, that the N-minus-1 test can't be used after the fact. And this clearly shows, at least the white paper contemplates it. And number two, this white paper, frankly, I'm just, I suppose I'm trying to show that my clients who have been confused do not understand that they did not intend to apply an N-minus-1 test throughout. My colleagues have no additional questions for you at this time. I guess we'll hear from counsel for the other commissioners. Ms. Kimmel? Yes, good morning. Can you hear me okay? Yes. Okay, thank you. May it please the Court, my name is Phyllis Kimmel, and I'm arguing on behalf of Campus Electric Power Cooperative and on behalf of petitioners. I will be addressing the filed rate doctrine and the study process rules. I'd like to reserve two minutes for rebuttal. At the outset, even if this Court agrees that or finds that SPP was implementing the attachment D-2 tariff correctly, there are still two fundamental problems with FERC's orders. One is the filed rate doctrine, and the other is SPP's violation of the study process rules. So, Ms. Kimmel, here the but-for method was, well, it's not a but. Say the but-for standard for upgrade credits was put into the filed tariff. And that standard was arguably underdetermined. It didn't say how but-for would be calculated. So what I'm wondering is, in a situation like that where a tariff has clearly set out that some rate will be paid, right, that petitioners in this situation would pay upgrade credits, but the method for calculating that is left undetermined. Does that mean upgrade credits cannot be charged by SPP until there's a further filing? Because it seems that that might be the consequence of petitioners' position here. So where there's an underdetermined rate, nothing can really be charged until there's a further filing. I mean, it could be that that could end up being a result. I mean, the Federal Power Act requires that charges be, you know, that customers receive notice, formal notice of charges in a specific manner. And here in this case, the service agreement is where the customers receive notice of their actual charges. There were a couple of questions earlier. What is, you know, the statement in our brief about would it have been enough to say that the charges are unknown? The brief we were trying to make a point, and perhaps it was a little imprecise. There's a tension. If the service agreement has said we have no idea what upgrades you're going to be charged for and we have no idea what those charges will be, customers would have at least had actual notice as to what was going on. Would that have been compliant with the Federal Power Act Section 205 requirements for charging rates? I don't believe that it would. But the petitioners here don't question that they were on the hook for upgrade credits. I mean, that was part of the tariff, that some upgrade credits would be paid. Maybe they didn't know how those would be calculated. Well, petitioners knew that they would have to pay for upgrade credits in some way. In some way, in some part. But where, in the study process, there were, SPP was obligated to provide notice in the study process of the upgrades and of the cost of the upgrades. In KEPCO's case, over half of the costs that my client is being charged are for upgrades that, as far as we can tell from the study, weren't even at issue at that point. And so, you know, we do believe that that's a problem, both with compliance with the study process rules and compliance with the filed rate doctrine. So, if the white paper had been filed with FERC, or, you know, some version of that explaining this methodology, would that have been sufficient? If the white paper had been filed and the tariff specified how the charges were to be calculated, and if the service agreement had specified the charges, those two components absolutely would have been sufficient. But what we have here is not the case of a formula rate where you can just blow inputs in after the fact. That's just not what is on. Can I just have a second? Sure. Because I thought that you added a few things to just the white paper. So what if just the white paper were baked into the tariff? The tariff cross-references the white paper. It says, look at the white paper. And that's it. If the white paper had been filed, then we'd have a harder case to bake here, Your Honor, but that's not what. Would it have been enough? Would that have been enough? Yeah. No, I don't think that it is. I think that we have not found anything in all of FERC's precedent, in the court's precedent, saying that a service agreement need not specify the actual charges. We just haven't found that. And as far as we know, that is pretty clearly what the Federal Power Act Section 205 requires. That's what FERC's rate regulations require. We're just not aware of anything where a service agreement can omit the actual charges, with the exception of. What does a service agreement have to do with the filed rate doctrine? Because I thought, and maybe it's a separate argument, but I thought part of your argument was that the filed rate didn't give you enough notice, not the ultimate agreement. So, our position is that the service agreement is the filed rate. That's where the charges to the customer appear. Oh, I see. Okay. Yes, I mean, there's, as Mr. Lowe explained, there is, SPP has a tariff. It's got thousands of pages, all kinds of terms and conditions. Different charges need to be calculated in compliance and consistent with that tariff. But in the end, there's a service agreement, and it says, KEPCO is going to pay $100, or KEPCO is going to pay $10 million. And if we don't have that information when we're presented with that service agreement, there's just no way for us to make an informed decision about whether we want to take on the cost. And the agreement gets filed. That gets complicated. The agreement, the service agreements used to get filed, and then FERC's regulations changed. And under certain circumstances, they are filed, but the rules treat them for the same purpose as if they were filed. It's in 35.1G, I believe, of FERC's regulations. But it has the same effect. Can I go back to one question that Judge Rao started with, which is that you agree that you knew that you would have to pay something by way of credits under C-2? Yes, I mean, there is, yes, there is always the possibility of having to pay credits. Not the possibility, not the possibility. I'm trying to figure out whether you knew that you were on the hook as a but-for-causer. In this case, when the service agreement said that there was only one upgrade, or that there was only one upgrade that was status, whatever, that met the but-for-tax. And in that case, the costs are not directly assignable to KEPCO. No, we didn't expect that we'd be paying for that. And there were four upgrades that were being charged for that weren't even part of the study process. They came along later. And no, that totals over half of the $6 million. And no, we did not have notice of that. What I'm trying to understand is, what I'm trying to understand is the following, is that on your argument that the use of, I guess it's the RSA test, the RSA analysis, that the RS analysis, sorry, PBA, that it doesn't satisfy the but-for test. And I'm looking at paragraph 39 on JA 185, which I think is the commission's response to your rehearing petition. And it contains the following sentence. Because there was insufficient available capacity in the forward direction immediately prior to the creditable upgrade, any use of the upgrade in that direction by a new reservation is considered to be facilitated by the additional capacity created by the upgrade, and thus satisfy the but-for test. So I take it the commission's view, and we can ask the commission about it, is once you know that a request results, a new request results in the use of the upgrade in the forward direction, the same direction that gave rise to the need for the upgrade, well, then but-for is already satisfied. Because the only way that would have been possible is the upgrade. And do you agree with that? Or do you think that's not true? I'm not sure, but what I do know is that what's very clear is, I'll start with the low-hanging fruit. It's the upgrades that weren't studied, that Kansas Electorate put in a request for service, and there were four upgrades identified as potentially being needed to be made so that we could have the service. Now there's new upgrades that were being charged for, so there's no but-for as a factual matter. There's just no but-for on those. What's wrong with that sentence, I guess, is my question. You must think there's something wrong with that sentence, because as I understand it, that's the commission's explanation for how its implementation of Z-2 in the forward direction satisfies the but-for test. You obviously think that the way they do it does not satisfy the but-for test. Maybe I'm missing something. They think any use of the upgrade in the forward direction necessarily satisfies the but-for test. That's my understanding of the rationale. You must disagree with that. You must think that's not true. Not any use in the forward direction. We have two problems with that. One is the sentence itself, but two is that there's a premise that there are upgrades that you're looking at measuring whether there's a use in either direction. Our point is that at the time when the service requests were put in, these upgrades weren't even identified as being needed in the first sentence. So, we don't understand how we can then legally or lawfully be charged for those.  Ms. Kimmel, can I ask you a question about the standard of review here? I mean, this is a Section 206 proceeding, so petitioners bear the burden to show that the rate is unjust and unreasonable. Do you agree that that's the standard here? No, Your Honor. It is a 206 filing, but what we have argued is there's a couple of different ways that a Section 206 complaint can be made. One is that you're arguing that the existing tariff is unjust and unreasonable, and then you advocate for a replacement. What we're saying here in a different type of filing made under 206 and actually 306-309 of the Federal Power Act is that there is a rate on file, which we believe was our service agreement, and that wasn't complied with. So, our view is that there is a violation of the filed rate doctrine, and so it's a different standard. And do we, counsel, for the other petitioners, suggest that we review FERC's determination here under the Arbitrary and Compersion Standard? Do you agree with that, or do you believe that we review it de novo? So, FERC has said here that there's no violation of the filed rate doctrine. Do we review that determination for reasonableness, or do we review it de novo? I believe Mr. Lowell said that we review it for reasonableness under the Arbitrary and Compersion Standard. I would need to double-check that, Your Honor. The de novo, to my knowledge, the de novo review comes into the contract interpretation, whether the court believes that the language of attachment C-2 itself is ambiguous. But I would need to double-check that, and I can find the answer, and perhaps answer on rebuttal. Let me make sure my colleagues don't have additional questions for you. All right, we'll give you a little time for rebuttal. Thank you. We'll hear from the Commission now. Ms. Pacella? Good morning, Your Honor. Scott Pacella for the Commission. Can you hear me? Yes. Thank you. I think I'll start with, like I said, that last question that Judge Rogers asked. And certainly the interpretation of the statute itself is not really an issue here. The Commission used its own expertise to explain why the filed rate doctrine is satisfied. It interpreted a tariff here, and the Commission approves that tariff. The Commission has reviewed that tariff over the years. So it is definitely arbitrary and imprecious review regarding the Commission's determination. I mean, the filed rate doctrine is rooted in statutory requirements. So whether there's been a violation of the law, which is sort of encapsulated in the filed rate doctrine, why wouldn't we review that? Because we're not interpreting the statute, and I'm not saying that would be not arbitrary and imprecious review if we were, but we don't even have that situation here. So what we have here is the Commission interpreting a tariff that it reviews and its own precedent to determine whether the filed rate doctrine, as this Court has set it out in Oklahoma Gas and Other Cases, is satisfied. And that is quintessential agency arbitrary and imprecious review. I have a question about this. I mean, to comply with the filed rate doctrine, I mean, the tariff here, Z2, is at least, I mean, even if it's not quite ambiguous, it's underdetermined. It doesn't say how far is going to be calculated. It doesn't specifically. It doesn't specifically. It does indicate, we believe, the Commission believes, does indicate that it will be using a subsequent use now. Okay. So why, I mean, in a situation like this, where you have a term like OPFOR and the methodology, there's no clear formula set out, like no precise formula set out in the tariff. When the parties, when SPP and its stakeholders agree to the white paper, why wouldn't the white paper be filed with FERC? Would something like that ordinarily be filed with FERC? So, and I will answer your question. I just want to say, tissues have never argued that the white paper should have been filed with FERC. So I don't really think that. Well, that might fix the filed rate doctrine concern, though, right? If the RSA methodology had been filed explicitly with FERC amending the tariff or updating the tariff. Yes. I'm going to answer your question now. Of course, I need to and I want to. That happens. There are white papers and business practice manuals all the time that are not filed with FERC. That is the normal, ordinary course of business. And that's because tariffs themselves are extremely long and you cannot include in a tariff every detail that is then explained further in a business practice manual or a white paper. There is a standard to determine that the commission uses called the rule of reason, which is, again, not raised in this brief. The petitioners are not arguing that the rule of reason is not. It wasn't rated to the commission. It wasn't. No one has argued this. But the point is you determine using the rule of reason, and I don't know the specifics of it because it's not before the court here, so I didn't learn enough about it. But basically, the idea is using this rule of reason analysis, the commission determines whether there's enough in something that it has to be included in the tariff. And that's not been questioned here. Is that rule of reason standard from the Keyspan Ravenswood case, the Judge Scalia case in the 80s? I apologize for it. I just didn't – I just learned – because it's not – had not been raised, I didn't learn more about that. And I apologize for that. And it may well be. But it is an established commission method for determining whether something needs to be in the tariff. Because in that case from the 80s, which has been cited even recently by this court, you know, then Judge Scalia says, well, things that can be specified should be specified in a file break. And so obviously, you know, when they do the white paper and they come up with this methodology, I mean, in some ways that's showing that it's capable of specification. So why does that not then have to be filed with FERC? You know, I apologize. I just don't know. If this is you, I can tell you what the seller's view on this is. It's because of the very reason that I'm explaining is that tariffs are very long. And that – I mean, that is – that is a fact. Tariffs are very, very long. And everything is just not included. And that is normal, typical business practice. It's just how things are done. So what you're suggesting is we should consider this case as if the white paper were in the file break? No. I'm not arguing that the commission did not rely on the white paper as being part of the file break here because it's not filed with the commission. The commission only considers the white paper for purposes of determining the – as a last piece of information determining whether – what the ambiguous meaning of – the specific meaning of class 4 means under the tariff. So with respect to their argument that says they didn't have enough notice of what they'd be on the hook for, from the commission's perspective, what documents should we be taking into account to determine whether they had enough notice? So the commission found that there was adequate formal notice from four things. One is the text itself, of course. The text provided – That's just saying that there's going to be above four standards. It's explaining not just that, Your Honor, that there's going to be above four standards, but in the introductory paragraph of Attachment Z2, Section 2 at 827 and in Attachment Z2, Section 2B at 828 of the petitioner's brief, opening brief, where the provisions are set out. In the introductory paragraph and those other provisions, which I'll be happy to go through. I set them out in my brief. I'm happy to do it here as well. They point out not only will there be above four causation tests, but that it will be conducted based on a subsequent use analysis. And that is what the reservation stack analysis ends up recommending. And that's – so it's not a change to the tariff. The commission's point is that's exactly what the tariff statement is. The original – But didn't you only argue three sources for – with respect to Issue 2? I'm sorry, Your Honor. Did you only argue support resources for Issue 2? You're saying four now? No. Oh, I'm sorry. So there's the tariff. There's the explanation in SPP's filings and the commission's orders regarding those filings. And I may have misspoken. Oh, and the service agreements. So I broke down the explanation. Those don't go into that much more depth than what's already in the tariff. Is something material added by the other things you just ticked off? I'm sorry, Your Honor? I'm trying to figure out what do we look at to determine whether there is a notice. So the things that you just told us to look at are this, 827 and 828, which is the tariff. Right. And then you ticked off a couple of other things, the service agreements. And then one other item. And the SPP's tariff filings. Right. And what I'm wondering is for things beyond the tariff, things beyond what's 827 and 828, what did those other things add to what's already in 827 and 828? So what those things add is both. First, let me say that the tariff, again, it indicates that a subsequent use analysis will be used. And then the filings that were made regarding TACS and Z, 336, TACS and Z2, they explain that a subsequent use analysis was used there. And then in the 2008 filing, that- So that doesn't sound like that adds much. This is my next point. One of the things SPP explained in its 2008 tariff filing, along with it in its transmittal letter explaining its filing, was that the- And this is at- It's in the Kansas Election Board, Paragraph 69, JA-122. And it's cited in the transmittal letter, which is at JA-420. And it explained that the proposal is consistent with any existing tariff attachment Z's requirement that customers pay for new or increased uses of network upgrades. So the tariff filing itself explains that it was going to continue to use the subsequent use analysis as part of this. It's now added this by foreign language, but it explains why it changed the language. And it explains in that filing that it changed the language to recognize that there could be benefits in the opposite direction, not only in the forward direction. So there were free riders before, and now there wouldn't be free riders. So are you saying that this attachment to Z2 is ambiguous? Attachment Z2 is ambiguous, but only as to the specific but-for analysis that will be used. It's not ambiguous that there will be a but-for causation analysis. You just don't know which kind. And it indicates, the text itself indicates that there will be subsequent use. SPP's tariff filing indicates there will be subsequent use. The commission's orders indicate that it's always understood that there will be a subsequent use analysis for this. Before, it was attachment Z, and now that is attachment Z2. So how does the but-for and then the subsequent use analysis interplay with each other? Right. Good question, and I'm happy to explain that. As the commission explained, you need a satisfied under Rule 1, as Joanna just explained. Since SPP has already determined under attachment Z1's N-1 contingency analysis that the upgrade was needed to relieve post-constraint caused by the upgrade sponsor's service request, all new registrations that flow in that same direction are considered to also need that upgrade capacity. So you know that before the upgrade, the upgrade service couldn't be provided. That prompted the upgrade in the first place. So anything flowing in that same direction also would need that capacity. Why? I guess I don't understand that because isn't it possible if where the electricity goes is based on kind of a second-by-second estimation of where's the best place for it to go, which is the way it's been laid out to us. And how do we know that just because in one instance it's determined that it will use the new path means that it could only get through if it used the new path, that it wouldn't have also gotten through anyway regardless of the new path? So the analysis that's set out in the tariff is not the same type of need level that you would need, right? So there is a simplifying assumption here that if you have a certain amount of capacity on the system, you need an upgrade to provide the upgrade sponsor's service, anything that's going to flow on that. I understand that that's the same, but that's based on the tariff. The tariff says we will do it based on subsequent use. No, but I guess what I don't follow with that is, of course, it's based on subsequent use, and I see the word subsequent use in the tariff and in the subsequent filings from SPP and maybe in the service agreement too. You can point me to that. There's references to subsequent use, but just because there's a reference to subsequent use, I don't think it necessarily means that you can tell me why this is wrong, that every subsequent use satisfies the but-for test. It just says that determining whether the but-for test is satisfied will base it on subsequent uses. And it seems to me, yeah, that makes perfect sense. You base it on subsequent uses. You don't know yet what use is coming down, so you look at the subsequent uses and you determine whether they satisfy the but-for test. But it doesn't necessarily mean I don't think that you can tell me why this is wrong, that every subsequent use, just using the term subsequent use in a tariff was supposed to put somebody on notice that every subsequent use of the new pathway satisfies the but-for test. If you're going in the same direction. If you're going in the same direction, yeah, exactly. Only if you're going in the same direction. Yes. And that's because the, remember, attachment Z only had a subsequent use test. So it didn't go in one direction. If you flowed in the same direction, then you were on the hook for upgrade as reimbursement. And when... You're talking Z meaning before everything divides to Z1 and Z2? And so when SPP changed the tariff to the Z2 language, it wasn't changing. It didn't take out any of the subsequent use language. It just, it took out the directional language. It added in the could-not-be-provided but-for language. But it explained that the purpose of that was not to require that there's no way possibly... It was just to bring in these former free riders who were going in the opposite direction. It didn't really mean but-for in the same context that you might possibly think but-for would mean. And that you were supposed to be using a subsequent... They then explained, continue to use a subsequent use analysis. This is consistent with the prior provision. And so subsequent use is are you flowing on systems? The commission didn't just stop there. Flows are not enough. The commission explained we are using subsequent use analysis. If you... If we've already determined that the upgrade... If the upgrade, we've already determined that under an N-1 contingency analysis that service could not be provided for the upgrade sponsor, then we are deeming this also to be needed. And it is a different standard. I'm not hiding from that. I'm not afraid of that. It's just it's supposed to be a different standard. It's not supposed to be like an N-1. So you used the word, and I appreciate the use of the words deeming it to be, because it does sound to me then that it's kind of like a proxy. It's just saying we're just going to assume that every subsequent use wouldn't have been possible but for the upgrade. Because we already have had this N-1 contingency. Yes. So, in other words, there are definitely some uses in the future that wouldn't be possible but for the upgrade, because that's established by the Z-1, N-1 complex, because the only reason you have the upgrade is because there's a capacity constraint, and there needs to be an expansion of the capacity in order to accommodate some new requests. But whether a particular new request would have been possible but for the upgrade, it sounds to me like what you're saying is it was always understood, including at the time before the Z-1, Z-2 divide when all we have is attachment Z, it was always understood that we never looked at whether a particular new use would have only been possible because of the upgrade. We just assumed and we deemed that any new use was possible because of the upgrade. Even if it's possible, even if you could envision a universe. Actually, it might not have been N-1 contingency that was needed. It possibly could have flowed somewhere else. But that point is we're trying to figure out how to reimburse entities that build these upgrades. The tariff says subsequent use multiple times in this provision. The FPP's filings explain and the commission's orders explain that that was always intended to be used. So this is the commission's way of honoring both the but-for language and the subsequent use. Okay. Then I think I understand. I'm sorry to interrupt. Is the question just for a second? I think I understand the commission's approach for why the way you're doing the RSA and RSA methodology satisfies the but-for test. And then in terms of notice, would you take the position that what's at 827 and 828, which includes a reference to subsequent incremental use, that that was enough notice that at that point the petitioners knew because as long as they had a subsequent use in the new pathway that they would be on the hook for something, that that was enough, no more needed to be said about amounts, about precise way that the amount was going to be calculated? It is certainly enough to put the petitioners on notice that they might have to pay. If but-for causation is satisfied under attachment D2, that they might have to, that they would be charged for credit payments. Right. But just telling somebody that you might be charged, is that enough to satisfy? It is because it's a rate rule, and I appreciate you bringing that up so I can explain this. As petitioners acknowledge in their reply brief at 22, under this court's precedent in their site trans-Western, the trans-Western case, a rate rule in a tariff can provide the necessary notice, and D2 is a rate rule. So it is not a formula, but it is a rate rule that if but-for causation is satisfied under a subsequent use analysis, then you will be charged for credit payments. And a rate? Specifically, that can be determined through a white paper or business practice. But a rate rule means all you have to do is say that there's going to be a but-for analysis, and it's going to be based on subsequent use. That is enough. And I think the language is… Do we have a decision that says, what's the decision that says that, that a rate, a level of generality would be enough? It's, I mean, petitioners, as far as I think, conceded the point. They acknowledged this point, so I didn't further research that, but they cited trans-Western at 897X2nd 5-6. But we also have a lot of cases saying that the filed rate doctrine is kind of an impenetrable shield, and the only exceptions are very narrow, including whether there's a specific formula. And the filed rate cases that look at formulas, I mean, the formulas are very particular. They're not just something like some words like but-for subsequent use. They're, in fact, formulas that different market conditions are then input into to, you know, define the actual amount that would be owed. So I'm not sure how this would fit under the exceptions of the filed rate doctrine for formulas. So it's an odd position for me to tell you what the court's precedent means, and I apologize, but let me tell you our view of what the court's precedent is. As the court said in Oklahoma Gaps, quote, notice may satisfy the filed rate doctrine when entities have formal notice of the rate either through a court proceeding or through the courts. And it talks about the two examples of situations in which, you know, continually- I wrote Oklahoma Gaps. Exactly. So the point is the-and in Old Dominion, the court said that there's no violation of filed rate doctrine when buyers are on adequate notice, that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service. So these things together, these are all of the things the commission are relying on, things that were filed with the commission. The commission did not rely on anything that was not filed in a court proceeding, and also the tariff, obviously, but even the SPP rate filings, the explanations are contemporaneous with the filing itself to explain. I think this case is different from some of our other filed rate cases because it really is about the degree of specification that is necessary. I mean, I think the petitioners can see that they owe some kind of upgrade based on the tariff. And then the question is how specific does that have to be, which is why I was asking you about that key spam Ravenswood case, which is like one of the early cases discussing that. And then I think if it really is about how specific it has to be, then the standard of review does become quite important, right, if we're reviewing this for whether FERC is being reasonable in terms of how they interpret the degree of specification or whether we have to make a kind of de novo legal determination whether this level of specification is sufficient to meet the filed rate doctrine. And I think that I feel like I'm not sure I've gotten a very clear answer about that or, you know, with citations to our cases about how this question of specification should be reviewed by this court. I think the petitioner's point wasn't that the tariff wasn't specific enough. I think the petitioner's point was that the service agreements needed to lift the upgrades. Do you think that issue just isn't preserved? I don't think that's preserved. I really don't. I would have spent a lot of time preparing for this case. I would have spent a lot of time on the rule of reason and all that kind of stuff. Isn't it sort of basically that question when they say it doesn't satisfy the filed rate doctrine? They're saying there's no filed rate, right? It's not specific enough. Like we don't know what we owed because the formula wasn't filed with FERC, so we were not on notice. There's nothing in Z2 that tells us how, you know, we would know what we owed. But they're not saying something wasn't filed with FERC. That's what I'm saying. They're saying what the commission relied on wasn't sufficient, and that's a very different argument. And the commission didn't rely on anything that wasn't filed with FERC for purposes of determining the file. But I thought what they're saying is the stuff that was filed with FERC didn't give us enough notice about what we would owe. Right, and that's based on their argument that it needed to be in the service agreement, which just isn't true. I mean, there's no – they're only pointing to the filed rate doctrine to say that. And the service agreement incorporated – it's supposed to have incorporated the tariff and the service agreement. But I don't think they dispute that it incorporated the tariff. I think what they're saying is, taking into account the tariff, that's 827, 828, I think, right? They're just saying those words just don't give us enough notice of what we might owe. And the whole point of the filed rate doctrine is that it's supposed to make us make an intelligent choice based on what we might be on the hook for. So it has to be at some level of – I mean, the best would be something that tells us exactly what we owe. And then I think we can all agree that it doesn't require that. But it has to give you some indication of what you might owe. I think – and perhaps I'm wrong, but I really think that their argument is a little different than that. Their argument really is the tariff says what the tariff said, and that the service agreements needed to specifically set out what upgrades we would be charged with. And, you know, that – But aren't you also relying a lot on the white paper that's, you know, not filed, but something that's in play years later? Not for purposes of the filed rate doctrine. This is only relying on the white paper for purposes of determining what's ambiguous before the provision. Can I just – I'm sorry to interrupt, but I want to make sure we still have the connection. Okay. Sorry. I just want to make sure to cancel. We lost our screen. Sorry. I had a special question. Does FERC ever use the N-1 analysis for something other than initial allocation? Absolutely. Okay. Petitioner doesn't cite any case in which we have and we are completely unaware of any situation that is only in initial cost allocation. So, from FERC's understanding, is the petitioner's argument that this is unreasonable because – you know, is the main reason that this is unreasonable from petitioners, like what petitioners advance to FERC, that they – that SPP failed to use the N-1 analysis? Certainly that was Excel's argument below, and it's definitely went its way through petitioner's briefs. They say in their reply brief that they're not saying that. Kansas Electric didn't argue the same way that it has in N-1 contingency analysis to the commission. They don't know what other analysis they think should be, you know, used. I mean, the stakeholder process, you know, thought about this pretty hard, and the white paper set all this out. And my understanding is, and perhaps I'm wrong, that the record indicates that Excel was actually on the credit task force. So, because this is a 206 proceeding, the petitioners have the burden to show that it's unlawful or unjust and unreasonable. Either one. I'm sorry? It can be – under 206, one of their arguments could be that it's unlawful, right, because it violates the filed rate doctrine. Whatever the standard is, it's petitioner's burden. That's right. What is the standard? Standard? In our view, it's arbitrary and fictitious review except for the determination whether Z-2 is plain or ambiguous. But to the extent that under 206 the petitioners are arguing that there's been a violation of the filed rate doctrine, isn't that a legal argument under 206? It is. And if it's a legal argument, right, that there's been a violation of the filed rate doctrine, isn't that something we review to know, though? I think it's for the court to determine. They don't argue – petitioners didn't argue to the commission that the filed rate doctrine requires something different than what the commission addressed. The petitioner's argument is that the commission improperly analyzed the tariff and the service agreement requirements, which are all FERC-approved, FERC-regulated, FERC jurisdictional things. And this is very plainly – I mean, this is a complicated case. And, Your Honors, please don't take this as that I'm insulting your intelligence, because I'm certainly not. But this is really quintessential FERC stuff. This is hard to understand, and it takes the commission's expertise to figure this out. This isn't just some issue that perhaps would be anybody – you know, an Article III judge without the expertise that FERC has put aside on its own. Respectfully. I think it's interesting that in my response to what the standard of review is, you fall back on, well, FERC is the expert agency, right? Because if there is a legal question that is at the heart of this, then we have to review that de novo. And I just feel like you're not quite answering that question. And I think to fall back just on the commission's expertise, which I respect, is not an answer to a standard of review question. So perhaps I'm not understanding exactly what your question is. I'm truly – I'm not trying not to answer it. But I guess it's because the issues – it's just – it's not something that petitioners have argued. They're not saying the commission misinterpreted statute, the statutory requirements. They're saying – Of the filed rate doctrine. Of the filed rate doctrine. And they're saying – and they're not saying that the commission misunderstood what the commission viewed as Oklahoma Gas saying that matters filed with the commission are part of the filed rate doctrine. We can look – they can provide notice of the filed rate doctrine. They're not disputing any of that. Their dispute simply is that the commission's analysis of its view, its expert view, satisfies the filed rate doctrine requirements. It's set out and it's accepting what the court has said. It's not interpreting the statute. It's not interpreting – it's just interpreting the tariff to see whether it provided adequate notice. And whether the service agreement provided adequate notice. And whether the – so I just don't see – You don't understand the petitioners to be saying that this tariff, that Z2 violates the filed rate doctrine because it was not specific as to what rate credits. You do not understand them to be saying that. I guess we'll ask them on rebuttal. I do not see it that way. And I don't – the commission did not see it that way. The commission and I viewed it as simply being that the service agreements needed to list the – and that's a 2013 – that's a different tariff later on. That was required in 2018 that you had to include the service agreements. That's what the basis of the argument was. We didn't know because you didn't list them in the service agreement. And they also make their Z1 argument. So as far as you're concerned, ORC hasn't even made an argument in its briefings that they got enough notice about the level of costs that they might be subject to. Because you didn't understand them to be arguing if you hadn't been specific enough. Oh, no. The commission absolutely believes that they were adequately notified from the tariff and the service agreement and the commission's orders in the prior orders and STP's filings that they would be charged for these if the subsequent use of OR analysis was satisfied. No, not the fact of whether they would be on the hook. Whether they knew enough about how much. But that is – the commission's point is that that's sufficient, Your Honor. There was no requirement anywhere. So the commission thinks that as long as the filed rate tells somebody you're going to be on the hook for something, we won't tell you what. You're just going to be on the hook for something. And then later on we'll tell you what. That's enough notice. Well, because it's a rate rule. So it's just kind of like with a formula rate and they're different. And I understand that. But there's a rate rule that you will be charged to reimburse entities who paid for upgrades. You will be charged to reimburse them based on subsequent use analysis that if the subsequent use of OR causation is satisfied. And that's all that needed to be in the tariff. I have one – a couple of others just to follow up. That's right. On Z1 and Z2, one thing I'm not quite understanding, and I'll ask the Intervenors Council this too, is I had understood that Z1 tells the upgrade sponsor. It's speaking to the upgrade sponsor. That's right. Not to upgrade users. It's talking to upgrade sponsors. And it's talking about the fact that if you're the upgrade sponsor, then you're initially on the hook for the cost of the upgrade. And then Z2 then goes on to say that the upgrade sponsor can be reimbursed from upgrade users through revenue credits. That's right. So there really wasn't any obligation under – that the study provide creditable upgrade notification. But then why didn't the commission – and I don't see anything, and even in your brief, or in the commission's – and if I could just finish the question, because I know you're antsy, but I just want to just get out my question to make sure that you're addressing the question I have. Why wouldn't the most straightforward answer have been, why are you even making a claim under Z1? Because you're a Z2 entity. You're an upgrade user. You're not a Z1 entity. So we didn't owe you any notice under Z1. Z1 wasn't speaking to you. Z2 speaks to you. Do you understand my question? I absolutely do. And I didn't see that answer anywhere. So it is, as the intervening brief pointed out, it is in the orders a bit. The commission says it at – in – sorry. Is it in the brief? Can I just ask you? And I'm trying to pick – No, no, no. I hear you. It doesn't have to be in the brief while I'm finding that. I'm looking at the wrong page. I apologize. That is something that the court can decide on its own. But I guess the thing is, from what I read in your brief, and I saw it in the orders too, it's assuming that Z1 – Exactly. It's assuming that Z1 is relevant. And it's saying – and we did provide enough notice under Z1 where it seems like the better, or at least the more fundamental answer is, why are we even talking about Z1 with you? Exactly. And that's what happened during my preparation for the briefing. Okay. And as the intervening brief points out, and FERC Brief 8 does point this out as well, that in the Kansas Elected Court Hearing Order at JA168-69, paragraphs 4 and 5, and note 9, and at JA177, paragraph 23, which quotes the Z1 provision, and in the Excel Hearing Order, JA443, paragraphs 4 and 5, the commission explains that Z1 is about identifying and providing estimates for new upgrades. And these are not new upgrades under Z2. You're dealing with existing upgrades. So that's all the commission said about that new order, is that your honors can decide this issue on their own because, as your honor figured out, Z1 just plainly doesn't apply to these credible upgrades. And the question is whether we think that the orders actually rely on that rationale because we can't supply a rationale that's not in the orders. Well, you can actually when something is plain. And I apologize for not having the precedent for that. And that's been written in an opinion where the court said it wasn't in the commission's order. But fortunately, that doesn't matter because we are making a determination based on the provision itself that it's plain, but you would do de novo yourselves anyway. And you can make that determination even if it's not in the commission's order. Just Z1 and Z2. Does Z1 incorporate Z2 charges? Z1 does not. Z1 does not incorporate Z2 charges. They have different but-for analyses. Z1 is, as the commission explained, it's about new upgrades. Determining whether someone comes in and asks for something, what's limiting your service? Z2 is about what you used. You weren't limited by those upgrades. The upgrades existed, and you were able to use them, and therefore you can use Z2. My last question, I think, is not about Z1, Z2. It's about Rule 1, Rule 2, which goes to the implementation of Z2. And it's more of a conceptual question. And that it's the way Rule 1 is laid out, it makes the assumption, the deeming that we talked about earlier, which is that every use by a new requester satisfies the but-for test. And therefore, we don't have to go through and try to figure out which particular uses are only made possible by the upgrade. That's the way Rule 1 is spelled out because it's going in the forward direction. And then when you come in the backward direction, the reverse direction, whatever the terminology is, we need to do more than that. We can't just assume that a use in the reverse direction satisfies the but-for test. We have to drill down deeper, and we have to figure out whether this particular use is one that is only brought about because of the change. And I guess my question is, if that can be done in the reverse direction, why isn't that just the same thing being done in the forward direction? All you're doing in the reverse direction is not all because it's plenty. What the commission does, what the analysis requires in the reverse direction is that you look at the capacity before the upgrade, and you determine whether the service request could be satisfied by that capacity before the upgrade. If it can be, the but-for causation test is not satisfied. If it can't be, the but-for causation test is not satisfied. So an N-1 contingency analysis is completely different. You put the service request in, you take the upgrade out, and the white paper explained and the commission explained as well the three reasons why you just can't really do that. In other words, I guess you keep N-1 out of it because I'm not worried about the details of it. I guess conceptually what you're saying is, in the reverse direction, there was excess capacity. I mean, there was excess room. And so we can test whether the amount that's being used would have fit within that margin. In the forward direction, we already know there wasn't any excess room. So we're necessarily not able to do that. No one, excuse me, SPP hadn't done the analysis in the opposite direction under Z-1. Okay. And so it needed to happen under, something happened to happen under Z-2. And that is the subsequent use analysis. I'm sure there's no further questions. And then I thank you. Thank you. Although before we do that, can I make sure that we lost the entire video feed? Do we still have counsel? We do. Okay. Mr. Bennett. Good morning, Your Honors. May it please the Court, Matt Bennett for SQP and the Interveners. I'd like to start with what you were just discussing, which is the Rule 1. And I think you hit the nail on the head. Prior to the credible upgrade, there was no ability to flow in that direction. So when that credible upgrade was put into service, that alleviated that constraint. So when the next user comes into the system and wants to flow across that same constraint, that constraint's already been relieved because of the credible upgrade. Whereas in the reverse direction, there's no guarantee that's the case, which is why SQP applies the extra tests under Rule 2. I'd like to turn to the file break doctrine issues that were discussed with Judge Rouse's questions. I don't read the petitioner's briefs as saying that attachment Z-2 was not detailed enough. In fact, they said attachment Z-2 was unambiguous. They didn't say that attachment Z-2 needed more detail. They said we applied the wrong test. Obviously, we found that it wasn't ambiguous and found that multiple potential tests could satisfy the but-for and subsequent use language. And the one that we applied was reasonable. So their file break doctrine objection with respect to notice, I think, really arises under which upgrades they were going to be required to pay for, which is an attachment Z-1 file break doctrine objection, which, as Ms. Sella said, the tariff didn't require us to list the attachment Z-2 upgrades in an attachment Z-1 study agreement or study report or agreement because those are two entirely separate processes. It wasn't until 2017 that SQP made a filing to modify its tariff to require SQP to now list creditable upgrades going forward in the network service agreements. And that's just simply to provide people with more information now that we have more information to provide. Ms. Chernow, why didn't SQP file the white paper or, you know, something like that? Say we're going to use this RSA, you know, or RS analysis to calculate credible upgrades. Is that the sort of thing that ordinarily would be filed with FERC because it specifies the rate or it affects the rate that will be paid? It affects the rate, but as this court has found, there's an infinity of practices that affect rates. That's the city of Cleveland case. I don't have the citation right in front of me. I apologize for that. Utilities rely all the time on unfiled manuals to supplement and provide the implementation details for the obligations that are set forth in the tariff. SQP's tariff already spans more than 5,000 pages. If SQP had to file every implementation detail, such as the white paper, its integrated marketplace protocols that provide the details for how SQP runs its data in real-time markets, the tariff would be 20,000, 30,000 pages. Are you aware of other 206 cases that are 206 challenges that challenge the specification of a tariff and an implementation doctrine in this way? I'm sorry. I don't quite understand the question. So the challenge here is that the specification, you know, the white paper that, you know, that set out essentially what they would pay was not, you know, it wasn't part of the filed rate. And so, therefore, the filed rate is underspecified. Well, the filed rate, as Ms. Pacella said, there's the rate rule precedent, which is the tariff sets forth the obligation. And what the unfiled manuals do is they provide the detail as to how you calculate that obligation. So the tariff already says you will pay credits if your service could not be provided but for the upgrades. And, obviously, we have a difference in interpretation as well, but for me. Right. But nobody questions that they owe upgrades. Right. Yeah. But calculated some way. Right. But, I mean, you know, there are other provisions of the tariff and service agreements that don't provide specific charges. I mean, for example, SDP runs a five-minute real-time balancing market across its 14-state footprint. SDP doesn't publish every one of those market prices in the tariff or in the protocols. They simply can't. So when you're talking about all these creditable upgrades, having to publish specifically what the charges are in either the tariff or the service agreements, it's just it becomes such a huge endeavor and it's not really required if the obligations are already set forth. And if the service agreement complies with the tariff attachment under which it was signed, which is attachment Z1, and they haven't suggested that we didn't comply with attachment Z1 with respect to identifying new upgrades that were required by their service. What their complaint is that we didn't identify the Z2 upgrades. But the Z2 and Z1 analyses are different analyses to address different issues, different types of upgrades, and there was no requirement to do that. Did that answer your question? It did point to a couple of places in the service. I think it was in the service agreement that they understood to be a notation that they wouldn't owe anything. And do you know what I'm talking about? Yeah. I don't have it right in front of me, but I believe when the service agreement said they wouldn't owe anything, that was for new upgrades. Right. That was my question is that was a statement that would be relevant to Z1. Right. Not to Z2. Yeah. And then there's a subsequent notification right below that that said, with respect to existing upgrades, you might owe something. Right. Yeah. That's how SPP does it? Yeah. Because then they wouldn't owe anything with respect to under Z1 because they weren't, for these purposes, in the possession of being the upgrade sponsor that's requesting. Right. And if you look at their service agreements at the time that they were signed or at the time since they were signed, they do list a number of, at least in Southwestern Public Services case, they list a whole bunch of upgrades that are required. Those were required either under Z1 or those were upgrades that are already part of the S&P transmission system but weren't yet built, but their service was contingent on those being and going into service. But there was no, up until 2017, there wasn't a listing of attachment Z2 upgrades. So, when the service agreements talk about, you know, in shorthand, you don't owe anything, that is for attachment Z1 new facilities that are identified through that aggregate study process. That's all it is. And that's why the notations were included in the study report. That was just to provide all the information that we had available at the time. We could surmise that there were certain Z2 upgrades that may be impacted by their service. I mean, obviously, something that's very close, approximately, or electrically close, you know, is something that most likely, yeah, you're going to trigger a flow on an upgrade. So, some of those were listed in the service, not in the service agreement, rather in the study report. But we didn't put them in the service agreement because there was no certainty that those would actually be, yeah, and there's also no obligation to do so at the time. If I could just address, if I could just address one more point. The Council for Excel pointed to the white paper and discussed how they didn't think the white paper was going to be used to implement attachments Z2. And they pointed to page 3, which is Joint Appendix 275, the last paragraph. I'd like to talk for a second about a couple paragraphs in this particular page. So, they cite the last paragraph, but I'd like to go up to the first full paragraph. The very first sentence says, the CPTF, which is the Crediting Process Task Force that put together the white paper, recommends that the reserve second system and the subsequent use rules be used to determine if the but-for conditions have been met. I don't see how the white paper could not have been clearer that the white paper was designed to implement the but-for requirement. So, the idea that, oh, we didn't know when we voted for this that you were going to use it for this purpose. I don't see how they can make that claim credibly. With regard to their paragraph about where we do reference the M1 analysis, that relates to sponsored upgrades. And the reason why sponsored upgrades are treated differently is that they're unilateral. Somebody comes along and says, I want to build this, okay? At the time they want to build it, all SPP does is takes a look at the upgrade and says, okay, is this going to harm us, in which case you have to mitigate that harm. It doesn't necessarily become part of the SPP transmission system that SPP is going to use until there's a subsequent use. So, at that point, that's why you would apply the N-1, because if someone else comes along and says, okay, I have this service, you would have to look at that upgrade individually to see if it is now creditable. And so that particular paragraph is actually implementing attachment Z2 on the right side here, attachment Z2 section 1B, which is on appendix page 51 of our brief. B talks about sponsored upgrades not automatically being a creditable upgrade, nor are they automatically eligible. That's why we applied that separate test. So we weren't admitting there that, oh, N-1 can work for all of us. We were just distinguishing this particular type of upgrade that is a, I say unilateral, I mean, it's an elective upgrade. It's not something that SPP has determined is needed as part of its system. So that's why there's a difference there. Okay. I have additional questions for you. Okay. Thank you, counsel. Thank you very much. We'll give petitioner's counsel a rebuttal. Mr. Lowe, we'll give you two minutes. Thank you, Donna. So in Old Dominion Electric cooperative, this court explained that there was, you know, no equitable considerations that would permit waiver of the software. Now, here we had a chair that defined who was responsible for that main credit. This is testimony Z-2. It states that it is that service that could not be provided for the upgrade. We heard her solicitor talk about how it is a subsequent use test. The subsequent use test is how we calculate the credits. The test states that the credits shall be based upon subsequent use. And then above that, it defines who will be responsible by defining the universe of people who will be on the hook, pay a credit based upon subsequent use. We talked, there was a discussion about the rule of reason. As you know, that rule of reason requires that any practice significantly affects rates that must be put on section 205. Here, I don't think there can be any question that the white paper significantly affected rates. FERC has to look to it to figure out what the tariff is. So, it should be quite clear that it should have been fine unless it was going to be used to determine rates for us. Are there any other questions? I don't think so. Thank you, counsel. We'll give Ms. Kimmel her rebuttal time. Ms. Kimmel, you have two minutes. Can you hear me now? Yes. Okay. Thank you. So, turning to the question about the standard of review, I believe that the standard of review regarding a complaint addressing the file rate doctrine would be that that was applied in the Old Dominion case, which I believe Ms. Crackett, did FERC act arbitrarily and appreciately? Did FERC adequately or reasonably explain its decisions, which obviously we maintain that it did not? FERC's counsel said that, I believe she said that everything that was relevant to the rates were filed at FERC. Obviously, the white paper was not filed at FERC. The white paper is where the interpretation of how V-2 would be implemented was. That was not filed at FERC. Intervenors included a citation in their brief to a FERC case, California ISO 147 FERC, paragraph 61-231, and that also includes the citation to the city of Cleveland case, which is 770-3S2, I believe, 1368, talking about the rule of reason. The interpretation of the white paper did, as Mr. Lillis said, significantly affect rates and, without having been filed, cannot be considered part of the filed rate. Finally, in terms of the upgrades, there were, as I had mentioned before, a number of upgrades for which transmission customers have been charged that were just simply not put in the service agreement. Nothing in FERC's orders that we understood parsed out a differential as to whether it was a new upgrade or an enhancement. The fact is that we're being charged for upgrades that, as far as we understood, V-1 did require an obligation for FCP to notify us as to what those upgrades in charge would be. That didn't happen. It didn't make it into the service agreement, and so we maintain there was a violation of the filed rate doctrine. If there are any other questions. I don't think so. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Rao, Childs